IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 22, 2016

**STATE OF TENNESSEE v. PRESTON J. CHAPMAN**

**Direct Appeal from the Criminal Court for Sullivan County
Nos. S59345, S59346    James F. Goodwin, Jr., Judge**

_____

**No. E2015-01232-CCA-R3-CD – Filed July 20, 2016**

_____

The appellant, Preston J. Chapman, pled guilty in the Sullivan County Criminal Court to felony possession of marijuana, third offense, and felony possession of a Schedule II controlled substance and received an effective two-year sentence.  On appeal, the appellant contends that the trial court abused its discretion by revoking probation for his failure to pay fines and costs when the evidence shows that he had no ability to pay and for his committing domestic assault.  Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Leslie S. Hale, Blountville, Tennessee, for the appellant, Preston J. Chapman.

Herbert H. Slatery III, Attorney General and Reporter; Meredith DeVault, Senior Counsel; Barry P. Staubus, District Attorney General; and Kent Chitwood, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In October 2011, the appellant pled guilty in case number S59345 to possession of marijuana, third offense, a Class E felony, and possession of marijuana, a Class A misdemeanor, and the trial court merged the convictions.  In case number S59346, the appellant pled guilty to possession of a Schedule II controlled substance, third offense, a

Class E felony, and possession of a Schedule II controlled substance, a Class A misdemeanor, and the trial court merged the convictions. The appellant received consecutive one-year sentences to be served in community corrections. According to the judgments of conviction for the possession of marijuana, third offense, and the possession of a Schedule II controlled substance, third offense, which were entered on February 1, 2012, the appellant was to pay fines of $1,000 for each offense and costs "based upon [his] ability to pay." He also was to remain in jail until March 12, 2012, was prohibited from possessing alcohol, was to receive alcohol and drug counseling, was prohibited from taking prescription drugs without the approval of his probation officer, and was to maintain full-time employment.

The record reflects that on April 19 and May 1, 2012, violation of community corrections warrants were issued. On June 3, 2013, the appellant "pled guilty" to the violations, and the trial court ordered that he serve his sentences in confinement. However, in August 2013, the appellant was placed on determinate release probation under the supervision of community corrections.

On August 28, 2014, Stuart Canter signed an affidavit for violation of probation with community corrections supervision, alleging that the appellant had failed to pay court costs, fines, and fees and still had a court-cost balance of $4,547. According to the affidavit, the appellant "was granted Determinate Release Probation by the Department of Corrections on 8/01/13 [and] the expiration date of suspended sentence is 9/02/14." The appellant was arrested on September 19, 2014, and the trial court appointed legal counsel. On April 20, 2015, Mr. Canter filed a second affidavit for violation of probation with community corrections supervision, stating that the appellant had violated probation by committing domestic assault on April 11, 2015. According to the affidavit, the expiration date of the appellant's sentence was "Pending." The appellant was arrested for the latest violation on April 22, 2015.

At the June 2015 revocation hearing, Mr. Canter testified that he was employed by Sullivan County Community Corrections, John R. Hay House. After the appellant pled guilty in this case, he violated community corrections. On June 3, 2013, the appellant pled guilty to the violations, and the trial court ordered that he serve his sentences in confinement. Mr. Canter said he first came into contact with the appellant on August 5, 2013, when the appellant was "released from custody on determinate release [probation]" and "placed under our supervision." On August 16, 2013, the appellant signed a form listing the rules and regulations for the John R. Hay House. Rule eight provided that the appellant was "to pay all required fees to the Supervision and Criminal Injuries fund unless waived by appropriate authorities" and "pay off all court costs, fines and restitution as set by the Court." The appellant never made any payments toward his court costs or fines but made several payments toward his supervision fees, which were $45 per

month.  The appellant's determinate release probation was supposed to expire on September 2, 2014.  On August 28, 2014, Mr. Canter reported the violation.

On cross-examination, Mr. Canter testified that the appellant was employed. However, Mr. Canter did not know "to the extent which he was employed."  The appellant had his own landscaping business, and "times were hard there towards the end and he wasn't having much work but he was working as much as he could."  Defense counsel asked if the appellant possibly made two payments of $20 each toward his court costs that were instead applied toward his supervision fees, and Mr. Canter said yes.  Mr. Canter acknowledged that the appellant performed community service and did not fail any drug tests while on probation.

On redirect examination, Mr. Canter testified that the appellant had to "[put] on his monthly or his weekly reporting form how many hours he worked or how many days he worked and how much he got paid."  All of the forms showed that the appellant was self-employed.  On some of the forms, though, the appellant "didn't report any hours work at all.  There towards the end there is nothing marked that he worked at all."  Mr. Canter said that the appellant reported an income of $620 in August 2014 and that "we've asked him to pay something on his court costs."

On recross-examination, Mr. Canter acknowledged that most of the appellant's lack of employment occurred during the "winter months" and that nothing indicated the appellant applied for any type of aid or unemployment benefits.  He also acknowledged that nothing indicated the appellant refused to pay his court costs.  Mr. Canter stated that the appellant's income was "limited" but that "I think he could have paid $5.00 a month or $5.00 a week, you know, here or there."

Alice Hull testified that she had been the appellant's girlfriend for about three years at the time of the hearing.  In April 2015, they were living together.  Ms. Hull was a housekeeper at Holston Valley Hospital and paid their rent.  Sometimes she bought food, and sometimes the appellant bought it.  She said that they tried to "split" their cable television bill but that sometimes they did not have cable.  Each of them had their own cellular telephone, and the appellant paid for his telephone when he could.  Otherwise, Ms. Hull tried to pay for it.  The appellant did not have a driver's license, so Ms. Hull tried to take him everywhere he needed to go.

Ms. Hull testified that on the night of the assault, she and the appellant went to eat at Chili's and returned home together.  They got into an argument, and a police officer arrived.  Ms. Hull said that she could not remember exactly what she told the officer but that she remembered telling him that the appellant started the altercation and that her arm

was hurting. She denied telling the officer that the appellant pulled her out of the bedroom and threw her into the living room. She stated,

> I'm not sure if he grabbed my arm. You know, I don't really know how it happened. I don't know if he was just, you know, grabbing me to try to get me to talk to him but it wasn't like a, you know, angry grab I guess is how I'd say it.

On cross-examination, Ms. Hull testified that she and the appellant could not afford cable television for two to three months. Ms. Hull helped the appellant with transportation when he could get landscaping work, and they had expenses for her car such as tires, spark plugs, routine maintenance, and insurance. They did not have a regular doctor and went to the "ER" for medical treatment.

Ms. Hull testified that her argument with the appellant occurred because "[h]e wanted me to take him to get something to eat and it was like 2, 2 in the morning." When the officer arrived at their home, the appellant claimed that Ms. Hull had thrown a crockpot at him and showed the officer a scratch on his shoulder. Ms. Hull said that the scratch was actually a few days old and that it occurred when the appellant hit the corner of a dresser or chest of drawers. The officer photographed the appellant's shoulder and Ms. Hull's arm, and the appellant introduced the photographs into evidence. Ms. Hull said that she and the appellant had a loud verbal argument but that she did not assault him. She did not think he intentionally assaulted her. She said she was not afraid of the appellant and still loved him.

Officer Andrew Goddard of the Kingsport Police Department testified that on April 11, 2015, he responded to a call about a couple fighting in the roadway on Gibson Mill Road. Officer Goddard and another officer went to the location, but the couple was not there. Officer Goddard walked around a nearby apartment building, and an upstairs neighbor of the couple flagged him down. The neighbor said the couple had moved from the road into their apartment. Officer Goddard knocked on the apartment door, and Ms. Hull answered. Her clothes were wrinkled and disheveled. The second officer took Ms. Hull outside to speak with her, and Officer Goddard stepped into the living room and talked with the appellant. Officer Goddard said that he noticed the living room floor was cluttered and that food was on the floor.

Officer Goddard testified that the appellant claimed Ms. Hull got mad at him at Chili's and left him there. The appellant walked home from the restaurant and argued with Ms. Hull. Officer Goddard asked if anyone had been injured. Initially, the appellant denied being injured or injuring Ms. Hull. Officer Goddard then spoke with Ms. Hull, and she claimed that the appellant had grabbed her arm and pulled her from the bedroom

into the living room. She showed the officer her left arm, and he saw red abrasions consistent with an assault.

Officer Goddard testified that he arrested the appellant. As he was walking the appellant to his patrol car, the appellant said Ms. Hull had injured him by throwing a crockpot at him. When Officer Goddard and the appellant arrived at the jail, Officer Goddard looked at the appellant's right shoulder and saw an abrasion consistent with an assault.

On cross-examination, Officer Goddard testified that Ms. Hull claimed the appellant was "extremely angry" when he got home, that she was in the bedroom, and that he pulled her from the bedroom into the living room. Ms. Hull told the officer that she and the appellant had been arguing for thirty to forty minutes when he arrived. Officer Goddard said that the appellant was not "forthcoming" about the incident but that the appellant was cooperative. The appellant also "complained of having an abrasion on his knee during the scuffle." Officer Goddard photographed the appellant's knee and saw that it was "slightly red, looked like maybe [a] slight abrasion." Officer Goddard arrested Ms. Hull and charged both her and the appellant with domestic assault. He stated that Ms. Hull and the appellant "may have consumed some alcohol or taken some type of medication" that night but that "they were not intoxicated to the point that they couldn't care for themselves or behave themselves in public."

The appellant testified in his own behalf that Officer Goddard asked if he was injured. The appellant had slipped on a Tupperware bowl earlier, so he showed the officer his knee because "I thought he was just asking for medical purposes. I didn't know that that was to, you know, charge her with assault." The appellant scraped his shoulder by bumping into a dresser; Ms. Hull did not assault him. The injury to Ms. Hull's arm occurred when she scraped it on a door while they were moving furniture. The appellant said that he grabbed Ms. Hull's sweater on April 11 but that he did not grab her arm. Prior to the appellant's argument with Ms. Hull, she got mad at him, and he "walked across town" to get home. He and Ms. Hull were never in the street. The appellant said that he was "[n]ot really" mad about her abandoning him but that he got mad at "the very end" because he wanted to get something to eat.

The appellant testified that he gave Mr. Canter a couple of money orders and thought they would be applied toward his fines. He said that he would like to set up a payment plan and that he probably could afford to pay $50 per month. He said that if the trial court released him from confinement, he would live with Ms. Hull.

On cross-examination, the State asked, "You stated to the Court you thought you could pay $50.00 a month. Why weren't you doing that before?" The appellant answered,

> Because I was paying fees at the Hay House plus I was having to go every week and that was consuming $15.00 a week in gas so I was, you know, plus my half of the rent. You know, on 6 or $700.00, you can take 2 out for rent, $60.00 for gas and that and food there just really ain't much left.

The appellant denied saying anything about a crockpot to Officer Goddard.

At the conclusion of the proof, the trial court first addressed the appellant's alleged failure to pay fines and court costs. The court noted that the appellant reported $600 as income for one month and stated that "that's not a lot." However, the court also noted that the appellant took the stand in his own behalf and said that he could pay $50 per month. The trial court found that "based on his own testimony, that he's willfully not paid fines and costs, at least made an effort to pay fines and costs." Thus, the court found that the appellant violated his probation.

Next, the trial court addressed the appellant's alleged assault of Ms. Hull. The court noted that Ms. Hull testified that the appellant grabbed her arm but that she "tried to minimize it." The court also noted that Officer Goddard testified that Ms. Hull said the appellant grabbed her arm and pulled her into the living room. The court stated that the appellant even admitted on the stand that he grabbed Ms. Hull but that he thought he grabbed her sweater. The trial court addressed the fact that both Ms. Hull and Officer Goddard testified that the appellant claimed Ms. Hull threw a crockpot at him but that the appellant testified he never mentioned a crockpot to the officer. The court then stated, "It concerns the Court that the defendant said that under oath on the stand today so I don't believe him." The trial court found by a preponderance of the evidence that the appellant assaulted Ms. Hull and, therefore, that he committed a second violation of his probation. The trial court revoked his probation and ordered that he serve his sentences in confinement with credit for time served.

## II. Analysis

The appellant contends that the trial court erred by revoking his probation for his failure to pay anything toward his fines and court costs because he did not have the ability to pay and by revoking his probation for his assaulting Ms. Hull because the proof did not support the trial court's finding by a preponderance of the evidence that an assault

occurred. The State argues that the trial court properly revoked probation. We agree with the State.

Upon finding by a preponderance of the evidence that the appellant has violated the terms of probation, a trial court is authorized to order an appellant to serve the balance of the original sentence in confinement. See Tenn. Code Ann. §§ 40-35-310, -311(e); State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). When multiple grounds for probation violation are alleged, "[t]here need be only one violation of the conditions of probation to support revocation." State v. Phillip Thomas Wilcox, No. M2002-00667-CCA-R3-CD, 2003 WL 21047133, at *2 (Tenn. Crim. App., at Nashville, May 9, 2003). Probation revocation rests in the sound discretion of the trial court and will not be overturned by this court absent an abuse of that discretion. State v. Leach, 914 S.W.2d 104, 106 (Tenn. Crim. App. 1995); see State v. Pollard, 432 S.W.3d 851, 864 (Tenn. 2013) (concluding that abuse of discretion with a presumption of reasonableness is the appropriate standard of appellate review for all sentencing decisions). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

As this court has explained,

> [C]urrent law states that the court may lawfully make the payment of the fines and costs a condition of probation. State v. Perry Eugene Wallace, No. 01C01-9306-CC-00171[, 1993 WL 495293, at *3] (Tenn. Crim. App., Dec. 2, 1993). The law further allows that probation may be revoked for nonpayment if the defendant willfully refuses to pay or does not make sufficient bona fide efforts to acquire the resources to pay. State v. Dye, 715 S.W.2d 36, 40-41 (Tenn. 1986).

State v. Loroy Salter, No. W2009-00981-CCA-R3-CD, 2009 WL 5064969, at *2 (Tenn. Crim. App. at Jackson, Dec. 23, 2009).

Although the appellant did not have income some months, he testified that he made $600 or $700 other months. The appellant's probation officer testified that the appellant had not paid anything toward his fines and court costs and that he tried to get the appellant to pay "something," even just $5 per month or $5 per week. The trial court specifically concluded that the appellant willfully failed to pay his fines and court costs because he testified that he could pay $50 per month but had paid nothing. We conclude that the evidence does not preponderate against the finding of the trial court.

As for the trial court's finding that the appellant violated his probation by assaulting Ms. Hull, assault occurs when a defendant intentionally, knowingly, or recklessly causes bodily injury to another person; intentionally or knowingly causes another person reasonably to fear imminent bodily injury; or intentionally or knowingly causes physical contact with another person and a reasonable person would regard the contact to be extremely offensive or provocative. Tenn. Code Ann. § 39-13-101(a)(1)-(3). Assault committed when the defendant and the victim live together is domestic assault. See Tenn. Code Ann. § 39-13-111(a)(2).

Here, Officer Goddard testified that when he spoke with Ms. Hull on April 11, 2015, she told him that the appellant grabbed her arm and pulled her into the living room. The officer said he saw red abrasions on her arm consistent with an assault. At the revocation hearing, Ms. Hull did not deny that the appellant grabbed her arm. Instead, she said that if he did so, it was not an "angry grab." Moreover, she acknowledged telling Officer Goddard that her arm was hurting. Although the appellant testified that he did not grab Ms. Hull, the trial court found him not credible. We conclude that the State presented sufficient evidence for the trial court to conclude by a preponderance of the evidence that the appellant assaulted Ms. Hull. Thus, the court did not abuse its discretion by revoking the appellant's probation and ordering that he serve his sentences in confinement with credit for time served.[1]

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

---

[1] The trial court noted that the appellant received credit "[o]n the original violation" for the amount of time he spent on "true" community corrections after his guilty pleas.